FILED

10:26 am, 2/27/17

Tim J. Ellis
Clerk of Court

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RED EAGLE OIL, INC. | ) | Case No. 11-20857 |
| EIN: 83-0293859, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| ‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗ | ) | |
| | ) | |
| r2 ADVISORS, LLC, | ) | |
| as Plan Agent for the Red Eagle Oil, Inc. | ) | |
| Bankruptcy Estate | ) | Adv. No. 13-02024 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EQUITABLE OIL PURCHASING | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

This matter came before the court for trial on February 10, 2016, on Plaintiff/Debtor, Red

Eagle Oil, Inc.'s complaint and the Defendant/Equitable Oil Purchasing Company's answer and

affirmative defenses. At the conclusion of the trial, the court requested the parties file findings of

facts and conclusions of law. Having reviewed the record, testimony and exhibits, the court is

prepared to rule.

Plaintiff r2 Advisors, LLC is the Plan Agent appointed by Red Eagle's confirmed Joint

Chapter 11 Plan of Liquidation.[1] The court substituted r2 Advisors as Plaintiff after confirmation

of the Joint Plan.[2]

---

[1] *In re Red Eagle Oil, Inc.*, Case No. 11-20857 (D.E. 857 and 918, respectively).
[2] Adversary Proceeding Case No. 13-02024 (D.E. 8).

**Jurisdiction**

As stated in the stipulated uncontroverted facts, this court has jurisdiction under 28

U.S.C. §§ 157(b) and 1334. Venue is proper under 28 U.S.C. § 1409. This is a core proceeding

under 28 U.S.C. § 157(b)(2)(A), (B), (H) and (O). This adversary proceeding is brought under 11

U.S.C. §§ 548, 550 and 502(d).[3]

**Issues**

Plaintiff claims Red Eagle's transfer of its fuel supply rights to Equitable was a

fraudulent transfer, arguing that it transferred the rights without receiving equivalent value.

Plaintiff seeks to recover the value of the transfer for the benefit of the estate and its creditors

plus pre- and post-judgment interest. Plaintiff acknowledges that Equitable assumed certain Red

Eagle brand dollar repayment obligations, but disputes that this constitutes value under § 548.

Additionally, r2 Advisors seeks to disallow Equitable's proof of claim for $156,011.13.[4]

Equitable asserts the following defenses: (1) Red Eagle did not have supply rights to

transfer as the supply rights were ExxonMobil's property; and (2) if Red Eagle transferred any

interest, Equitable further asserts that it gave reasonably equivalent value by assuming the brand

dollar repayment obligations of One Stop Market, Lander, WY ($28,702.20), Rodeo West, Cody,

WY ($33.860.00) and Ron's Exxon, Cody, WY ($20,142.00).[5] Equitable argues that the

assumption of the aggregate value of the brand dollar payment obligations is reasonably

equivalent to the value of the transfer; and (3) Equitable argues that it is a subsequent transferee

because ExxonMobil consented to and approved the transfer of Red Eagle's supply rights. As

---

[3]  Unless otherwise noted, all statutory references are to Title 11 of the United States Code.
[4]  *In re Red Eagle Oil, Inc*., Case Number 11-20857, Claim No. 23-1.
[5]  Red Eagle also had a BIP repayment obligation to ExxonMobil for the dealer location at the Fast Lane, Shoshoni,
     WY for $53,041.50. No assumption document was executed as Equitable declined to assume Red Eagle's
     obligation. Subsequently, Exxon waived the payment obligation.

Equitable is not the initial transferee, it argues r2 Advisors may not recover the value of the

transfer.

**Findings of facts**

   The following are the uncontroverted facts as established by admissions in the pleadings

or by stipulation.[6]

   1.    This Court has subject matter and personal jurisdiction over all claims alleged in
the Complaint. Venue is proper and this matter is a core proceedings under 28 U.S.C. § 157. All
parties consent to final judgment entered by this Court.

   2.    On September 1, 2010, Debtor entered into a Branded Wholesaler PMPA
Franchise Agreement with ExxonMobil (the "Red Eagle PMPA Agreement"). The Red Eagle
PMPA Agreement was not the first PMPA Agreement between the parties; it was a renewal of a
five-year term for 2010-2015.

   3.    Prior to the petition date, Debtor entered into three ExxonMobil Distributor Brand
Incentive Program Agreements ("BIP Agreement"), as the Distributor of ExxonMobil-branded
fuel, for three dealer locations: One Stop Market (Lander, WY); Rodeo West (Cody, WY); and
Fast Lane (Shoshoni, WY).

   4.    Prior to the petition date, Debtor entered into ExxonMobil Branded Distributor
Loan Agreement, as the Distributor of ExxonMobil-branded fuel, for one dealer location: Ron's
Exxon (Cody, WY).

   5.    Prior to the petition date, Debtor was the wholesale supplier of fuel for the
following four dealer locations: (1) Lander, WY ("One Stop Market", Store #03340); (2) Cody,
WY ("Rodeo West", Store #08973); (3) Cody, WY ("Ron's Exxon", Store #09098); (4)
Shoshoni, WY ("Fast Lane," Store #81328) (collectively known as the Retail Stores).

   6.    Debtor purchased fuel from ExxonMobil, which it supplied on a wholesale basis
to the four dealer locations for several years. Debtor purchased the fuel from ExxonMobil at the
rack rate.

   7.    Debtor sold its fuel to the four dealer locations at the same price it purchased from
ExxonMobil, plus freight and costs, plus a price per gallon by agreement with each respective
dealer.

   8.    Debtor's gross profit included the price per gallon collected from the dealers.

   9.    Debtor also had additional sources to purchase fuel for its business. In 1997,

_____
[6] Final Pretrial Order (D.E. 57).

Debtor submitted a credit application to Equitable to establish an account to purchase fuel from Equitable. On April 15 and 18, 2011, Debtor purchased five loads of fuel from Equitable on credit at a cost of $147,728.04.

10.    On or around May 2011, Debtor owed ExxonMobil approximately $1.5 million. After May 11, 2011, the Debtor was required to prepay all fuel purchases from ExxonMobil.

11.    On or before May 5, 2011, Debtor received an offer to purchase its assets from IPC (USA), Inc. The proposed sale to IPC did not close.

12.    On May 12, 2011, Debtor's principal, Bryan Hinze, released all four dealer locations from Debtor and authorized them to become Exxon Dealers under Equitable.

13.    On May 18, 2011, Equitable filed a lawsuit against Debtor for failing to pay $147,728.04 for the fuel Equitable supplied to the Debtor on April 15 and 18, 2011.

14.    On May 19, 2011, Debtor, Equitable, and ExxonMobil executed an Assumption of ExxonMobil Branded Distributor Brand Incentive Program ("BIP") Agreement for the dealer location in Lander, WY ("One Stop Market", Store #03340).

15.    On May 19, 2011, Debtor, Equitable, and ExxonMobil executed an Assumption of ExxonMobil Branded Distributor BIP Agreement for the dealer location in Cody, WY ("Rodeo West", Store #08973).

16.    On May 19, 2011, Debtor, Equitable, and ExxonMobil executed an Assumption of ExxonMobil Branded Distributor Loan Agreement for the dealer location in Cody, WY ("Ron's Exxon", Store #09098).

17.    Through the assumption documents, Equitable agreed to assume Debtor's repayment obligations to ExxonMobil at three dealer locations, in the following amounts: (1) $28,702.20 (One Stop Market, Lander, WY); (2) $33,860.00 (Rodeo West, Cody, WY); (3) $20,142.00 (Ron's Exxon, Cody, WY), and ExxonMobil released the Debtor from those obligations.

18.    The BIP and Loan Agreements included ExxonMobil financing for improvements at each of the dealer locations, and repayment obligations owed by the Debtor to ExxonMobil for the financing.  In summary, provisions in the BIP or Loan Agreement between ExxonMobil and Debtor govern the repayment obligations to ExxonMobil.

19.    At the time Equitable assumed the BIP and Loan Agreements, ExxonMobil had made all payments due under the respective agreement.

20.    On May 18, 2011, One Stop Market (Lander, WY) executed a promissory note in favor of Equitable for $28,702.20, related to the repayment obligation Equitable assumed from Debtor for this dealer location.

21.     On May 18, 2011, Rodeo West (Cody, WY) executed a promissory note in favor of Equitable for $33,860.00, related to the repayment obligation Equitable assumed from Debtor for this dealer location.

22.     On May 18, 2011, Ron's Exxon (Cody, WY) executed a promissory note in favor of Equitable for $20,142.00, related to the repayment obligation Equitable assumed from Debtor for this dealer location.

23.     Like Debtor, Equitable has its own Branded Wholesaler PMPA Franchise Agreement with ExxonMobil (the "Equitable PMPA Agreement") dated August 19, 2010.

24.     Debtor did not assign the Red Eagle PMPA Agreement to Equitable.

25.     On or about May 19, 2011, Equitable became the ExxonMobil-branded supplier for the dealer location in Shoshoni, WY (Fast Lane, Store #81328).

26.     On or about May 19, 2011, Debtor's repayment obligation to ExxonMobil for the Fast Lane dealer location was $53,041.50.

27.     No assumption document was executed by Debtor, Equitable, and ExxonMobil for the dealer location in Shoshoni, WY. Fast Lane declined to execute a promissory note in favor of Equitable for any repayment obligation, and Equitable declined to assume Debtor's repayment obligation to ExxonMobil.

28.     In e-mails between ExxonMobil employees dated May 19, 2011, Beau Powers requested that ExxonMobil write-down the estimated repayment obligation for the dealer location in Shoshoni, WY. Mr. Powers' request was approved.

29.     Debtor authorized the release of the four dealer locations from Debtor and authorized them to become Exxon Dealers under Equitable less than two years before Debtor filed its bankruptcy petition.

30.     Equitable does not contend that Debtor was solvent at the time it authorized the release of the four dealer locations from Debtor and authorized them to become Exxon Dealers under Equitable.

31.     Equitable was the initial transferee of the ExxonMobil Branded Distributor Brand Incentive Program Agreement for the dealer location in Lander, WY ("One Stop Market," Store #03340).

32.     Equitable was the initial transferee of the Branded Distributor Brand Incentive Program Agreement for the dealer location in Cody, WY ("Rodeo West," Store #08973).

33.     Equitable was the initial transferee of the Branded Distributor Loan Agreement for the dealer location in Cody, WY ("Ron's Exxon," Store #09098).

34.     Equitable did not remit any funds to Debtor at the time it release the four dealer locations from Debtor and authorized them to become Exxon Dealers under Equitable.

35.     Equitable has not released or waived Debtor's $147,728.04 debt.

36.     On June 10, 2011, ExxonMobil notified Debtor that ExxonMobil was entitled to repayment for $53,041.50, the amount owing under the Shoshoni, WY (Fast Lane, Store #81328) BIP, but ExxonMobil waived its right to seek repayment from Debtor.

37.     On August 1, 2011,[7] Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code.

38.     On October 3, 2011, Debtor requested approval to employ Matrix Private Equities, Inc. to evaluate, market, and assist in the sale of Debtor's assets. On January 11, 2012, the court approved the employment of Matrix Private Equities, Inc.

39.     On November 3, 2011, Equitable filed proof of claim no. 23-1 in Debtor's bankruptcy case, asserting an unsecured claim for $156,011.13.

40.     On December 27, 2011, Debtor requested approval to employ r2 Advisors, LLC as Debtor's financial advisor. On January 11, 2012, the court approved the employment of r2 Advisors, LLC.

41.     On June 8, 2012, Debtor moved the court for approval of its sale of real and personal property for $9,450,000 to Brad Hall & Assoc., Inc. The court approved the proposed sale on September 12, 2012.

42.     On July 31, 2012, Debtor moved the court for approval to assume and assign the Red Eagle PMPA Agreement and certain ExxonMobil Distributor Brand Incentive Program Agreements to Brad Hall & Assoc., Inc. The court approved the assumption and assignment on September 12, 2012.

43.     Debtor's sale of assets to Brad Hall & Assoc., Inc. closed on or about December 13, 2012. Debtor's principal, Bryan Hinze, became an employee of Brad Hall & Assoc., Inc.

44.     On July 31, 2013, Debtor timely filed its complaint against Equitable in which it alleged that Debtor's transfers of its rights and interests in the BIP and Loan Agreements constituted fraudulent transfers, and commenced this adversary proceeding.

45.     Plaintiff r2 Advisors is the Plan Agent appointed by the Joint Chapter 11 Plan of Liquidation Proposed by Debtor and the Official Committee of Unsecured Creditors, dated May 3, 2013 (the "Plan"). The court confirmed the Plan on October 10, 2013.

46.     On November 11, 2013, Plaintiff properly substituted for Debtor as the party in-interest pursuant to paragraph 14 of the Confirmation Order.

---

[7] The stipulations indicate, in error, that Red Eagle filed its bankruptcy on August 31, 2011.

47.     Equitable has not returned any property, or the value of property, that Plaintiff seeks to recover in this adversary proceeding.

The testimony and evidence established the following facts. Red Eagle operated convenience stores throughout Wyoming and Montana. It operated as a wholesale distributor to the four Retail Stores and others, some of which Red Eagle owned and operated. Brian Hinze, acting as Red Eagle's vice president, testified that Red Eagle entered into the Red Eagle PMPA with ExxonMobil, the latest executed in 2010.

The PMPA Agreement is the agreement between ExxonMobil and the wholesale distributor, Red Eagle, for a five-year term that may be renewed. The PMPA established a "franchise relationship" between ExxonMobil and Red Eagle. It gave Red Eagle the right to use trade names, service marks, trademarks, logos, etc., in connection with the retail sale of ExxonMobil branded motor gasolines and diesel fuels at ExxonMobil-branded retail outlets operated by Red Eagle and approved independent dealers and sub-distributor retail outlets.[8]

The Red Eagle PMPA Agreement expressly states:

Branded Wholesaler may use or operate at an Operated Exxon-Branded Outlet, or grant and allow use of operation at a Franchised Exxon-Branded Outlet of any motor fuels business or Related Businesses . . ., only if:

(i)   ExxonMobil has expressly approved the Exxon branding of that retail outlet and the operation of the motor fuels business and/or Related Business at that retail outlet; and
(ii)   ExxonMobil has not:
    (A)   Debranded that outlet; or
    (B)   Withdrawn ExxonMobil's approval for the operation of the Related Business(es) in question at that retail outlet."[9]

. . .

In its sole discretion, ExxonMobil may approve or not approve the branding of any outlet or the use or operation of any Businesses proposed by Brand Wholesale. ExxonMobil is not obligated to furnish Branded Wholesale with a

[8] Branded Wholesaler PMPA Franchise Agreement, Stipulated Exhibit 1, p. 1, ¶1.
[9] Red Eagle PMPA Agreement at Stipulated Ex. 1, p. 2, ¶ (1)(e)(1).

reason for withholding approval. ExxonMobil's furnishings of a reason does not in any way limit its right to withhold for any reason any approval of that or any future branding proposal. Branded Wholesale shall comply, and cause its Franchise Dealers to comply, with any requirement and conditions imposed by ExxonMobil in giving its approval under this section."[10]

Subsequent to Red Eagle entering into the Red Eagle PMPA agreement with ExxonMobil, it entered into an *Exxon Branded Distributor Loan Agreement* or a *Brand Incentive Program BIP Agreement,* (collectively known as BIP Agreements) with ExxonMobil for the benefit of each of the four Retail Stores. Red Eagle was liable to ExxonMobil for each loan amount for the terms of the loans.[11]

The BIP Agreement provided that ExxonMobil would loan Red Eagle funds to front the four Retailer Stores for construction purposes in order to comply with the ExxonMobil retail store requirements. As long as the Retail Store continued to actively market Exxon-branded fuel and not cease operating as an ExxonMobil branded station, the BIP loan balance did not become due during the term of the agreement and the loan balance decreased with time. ExxonMobil considered the loan repaid at the end of the BIP term. No loan repayment was due between Red Eagle and ExxonMobil unless the term of the BIP was prematurely terminated.

Upon becoming a branded wholesaler, Red Eagle had years of prosperity. Red Eagle purchased fuel from ExxonMobil. Prior to 2005, as a wholesaler in good standing, Red Eagle enjoyed a 1.25% "prompt pay discount" for timely made payments. As Red Eagle began to have financial difficulties, ExxonMobil reduced the prompt pay discount in April 2011, to 1% and required payment within seven days. During this time, due to unpaid debt, Red Eagle granted

---

[10] *Id.* at p. 2, ¶ (1)(e)(2).
[11] The terms of the BIP loan agreements between ExxonMobil and Red Eagle for the Retail Stores, One Stop Market, Lander, WY, Rodeo West, Cody, WY, and Ron's Exxon, Cody, WY, were for ten years. The term of the BIP loan agreement for the benefit of Fast Lane, Shoshoni, Wyoming was for seven years.

ExxonMobil a security interest in its rolling stock.[12] On May 11, 2011, ExxonMobil terminated

the discount rate and required Red Eagle to pay cash for fuel on delivery. ExxonMobil received

some payments during this time from all credit card payments for retail fuel purchases at the four

retail stations, but it did not receive full payment for the fuel Red Eagle purchased. After Red

Eagle filed for bankruptcy protection, ExxonMobil filed a claim for $1,744,549.13.[13]

Also during this time, Red Eagle and its affiliates were attempting to sell all of their

assets. There were two offers, but neither ended in the sale of the assets. During this financially

difficult time, Red Eagle purchased fuel from Equitable, "pulling" five loads causing a debt of

$147,728.04. Equitable began its collection action in the state district court on May 18, 2011.

At the time Red Eagle transferred the wholesale distributor rights to Equitable on May

12, 2011, the BIP loan agreements had the following balances:

| | |
|---|---|
| Rodeo West | $33,860.00 |
| Ron's Exxon | 20,142.00 |
| One Stop | 28,702.00 |
| Fast Lane | 53,041.50 |

Red Eagle sold ExxonMobil branded fuel to each Retail Store at rates individually

negotiated. The agreements between Red Eagle, as the wholesale distributor and Ron's Exxon,

Rodeo West and One Stop Market as retailers, provided Red Eagle a $0.01 profit per gallon over

the rack-rate purchase price. The BIP agreement between Red Eagle and Fast Lane provided it a

$0.005 profit above the rack-rate.

Mr. Hinze contacted Equitable and informed it that he could not meet the needed fuel

demands of the Four Retail Stores. With the "blessing of ExxonMobil," Paul Sivertson,

---

[12] As stated earlier, Red Eagle had not paid ExxonMobil for its fuel purchases and granted ExxonMobil a security interest in its rolling stock. Equitable alleged the transfer of Red Eagle's rolling stock as collateral for the unpaid debt was a preferential transfer. However, this matter was resolved as part of the sale of the Red Eagle assets to Hall & Associates.
[13] Claim No. 45-1.

Equitable Oil's manager, stated, Equitable began supplying the Retails Stores on May 13, 2011. Mr. Sivertson testified that he would not have supplied a branded station, such as the Retail Stores, without ExxonMobil's consent to avoid violating his own PMPA Agreement with ExxonMobil. Mr. Sivertson testified that the PMPA is the "bible" according to ExxonMobil.

Three days after Equitable began supplying the Retail Stores, Mr. Sivertson, and ExxonMobil met to discuss the BIP Agreements between Red Eagle and ExxonMobil assignments. ExxonMobil required Equitable to assume the BIP loan agreement liability for each Retail Store; provide a letter of credit; provide collateral for a $500,000.00 line of credit; and verify volume allocations to ensure Equitable could supply the necessary amounts. Equitable assumed the BIP Agreements and required the Retail Stores to execute a promissory note in favor of Equitable for the BIP balances. Again, this did not include the Fast Lane Store, as it refused to execute a promissory note in favor of Equitable for its outstanding BIP obligation to Red Eagle. At the time of the transfers, ExxonMobil and Equitable had in place their own PMPA Agreement, modified in May 2011, as to volume, and providing Equitable a one-percent (1%) prompt payment discount. Mr. Sivertson stated that Equitable, having the systems and process in place agreed to supply fuel to the Retail Stores as it "fit into its business model." After the transfers, Equitable received $.005 profit per gallon over the rack-rate from all four Retail Stores. As of the date of the hearing, all of the BIP agreements' terms had terminated.

Kevin Bowen, an Equitable employee for 11 years, is employed in sales and branded dealer operations. Mr. Bowen testified that if the Retail Stores had not agreed to sign the promissory notes, it would not have assumed the fuel-supply rights. He also testified that he had never seen ExxonMobil change wholesale distributors of its own accord.

Mr. Hinze admitted he did not request forgiveness of Equitable's claim against Red Eagle or other consideration for the transfers. He testified that he did not want to hurt the Retail Stores during the beginning of their busy tourism season and made the necessary arrangements to get the retailers fuel. In his words, "it was a rough week" and the transfers "happened quickly."

On May 19, 2011, Equitable assumed Red Eagle's liability for the BIP agreements with ExxonMobil for three Retail Stores: Rodeo West, Ron's Exxon, and One Stop. Equitable assumed all of Red Eagle's "rights and obligations." In turn, ExxonMobil released Red Eagle from all BIP Agreement obligations. Equitable, to protect itself from liability, required each Retail Store to execute a promissory note for the assumed loan balances. Fast Lane refused to execute a promissory note for Equitable's benefit and was temporarily de-branded. However, ExxonMobil waived the loan balance, and Equitable supplied Fast Lane branded fuel through an executed BIP agreement.

On August 1, 2011, Red Eagle filed its bankruptcy petition.[14] After Red Eagle filed for bankruptcy protection, Equitable filed a claim for $156,011.13. After confirmation of the Joint Reorganization Plan, Red Eagle sold its assets to Brad Hall & Assoc., Inc., including nine retail stores, a bulk plant, and rolling stock, for the purchase price of $9,450,000.00. The sale included the assignment of the remaining PMPA agreements. Thomas Kim, managing director for r2 Advisors, testified that ExxonMobil was involved in the sale negotiations, as Red Eagle's PMPA was a valuable asset.[15] The court entered an Order Approving the Assumption and Assignment

---

[14] Red Eagle's shareholders, Dale Hinze, Judith Hinze, Bryan Hinze, Brad Hinze and Scott Hinze shared ownership in (1) Red Eagle, LLC, a Wyoming limited liability company, (2) Q&H, Inc., a Wyoming corporation, (3) WY-Mont Investments, LLC, a Wyoming limited liability company, (4) DMV, Inc., a Wyoming corporation and (4) Red Eagle Gaming, LLC, a Wyoming limited liability company. *See In re Red Eagle Oil. Inc.*, Case No. 11-20857, D.E. 630, ¶ 4.

[15] Thomas Kim, as an employee of r2, the plan administrator for the Bankruptcy Estate of Red Eagle Oil, Inc., participated in the sale of Red Eagle's assets to Brad Hall & Associates. Red Eagle filed a Motion for Entry of an Order Approving the Assumption and Assignment of Executory Contracts and Providing Cure Amount on July 31, 2012. Through negotiations with objecting parties, Debtor provided a settlement that allowed the Purchaser,

of Executory Contract and Providing Cure Amount,[16] which allowed Hall & Associates to

assume the Red Eagle PMPA and other BIP agreements (ExxonMobil Contracts).

To determine a value for Red Eagle's transfers of the fuel-supply right to Equitable, r2

Advisors retained Josh Harrison of Harrison Advisory as an expert for business valuations. Mr.

Harrison, using the income approach valued the transfer of Red Eagle's fuel supply rights at

$170,631.00 to $260,725.00. Below is a breakdown of Mr. Harrison's valuation:

|  | Present Value Income | Residual | Total |
|---|---|---|---|
| Rodeo West | $ 35,969.00 | $ 15,466.00 | $ 51,435.00 |
| Ron's Exxon | 22,835.00 | 15,045.00 | 37,880.00 |
| One Stop | 98,823.00 | 30,421.00 | 129,244.00 |
| Fast Lane | 13,004.00 | 29,162.00 | 42,166.00 |
|  | $170,361.00 | $ 90,094.00 | $ 260,725.00 |

Mr. Harrison testified he "backed-in" to the rack-rate costs by deducting taxes and freight

costs instead of using Red Eagle's invoices to determine the actual rack-rates. In completing his

analysis, Mr. Harrison testified he amended and recalculated the prompt payment discount from

1.25% to 1.0% and corrected an error, which reduced the fuel volume sold in 2011 to reflect the

May 19, 2011, transfers. Mr. Harrison testified he based the tax rates, freight cost per gallon and

historical information primarily upon the information Mr. Hinze provided.

Equitable objected to Mr. Harrison's use of the one percent (1%) prompt payment

discount as ExxonMobil terminated the discount due to Red Eagle's payment defaults. Equitable

also objected that Mr. Harrison did not disclose his fuel-volume adjustment for 2011 (891,000

gallons) on his amended Exhibit 38-A. During cross-examination, Mr. Harrison admitted he had

not reviewed the "dealer agreements," or the Red Eagle PMPA Agreement, and had not based

his value on the BIP agreements. Equitable argues the court should disregard his expert

---

Hall & Assoc., Inc. to assume the Red Eagle PMPA Agreement as part of the Order Authorizing and Approving
the Sale of Substantially All of Debtor's Assets Free and Clear of Liens, Claims and Interests.
[16] D.E. 770.

testimony as he assumed there were "dealer agreements" when Red Eagle did not have contracts that obligated the Retail Dealers to purchase fuel from Red Eagle in any amount or for a specific term. Equitable challenges Mr. Harrison's reliance upon Mr. Hinze's disclosures instead of making independent inquiries of fuel tax reports and freight invoices.

Additionally, Equitable argued that the court should disregard Mr. Harrison's residual value as speculative. Mr. Harrison explained that his residual value assumes the four Retail Stores would continue to purchase ExxonMobil branded fuel from Equitable at the same margin for an additional ten years after the current BIP and Loan Agreement obligation terminated. However, Mr. Sivertson testified it receives .05 cents over rack rate from the sale of ExxonMobil branded fuel to the Retail Stores after Equitable became their fuel supplier. This is .05 cents less than the agreements Red Eagle had with the three Retail Stores. Mr. Bailey and Mr. Powers each testified that a retail station changes wholesale suppliers if rates and terms are more beneficial to the retailer. Equitable risked losing the Retail Stores if it was not competitive.

**Discussion**

**1) Fraudulent transfer**

The Bankruptcy Code provides, as relevant:

> The trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> …
>
>  (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I)  was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.[17]

---

[17] § 548(a)(1).

The Bankruptcy Code's fraudulent transfer statute means to protect creditors from transactions that are designed to, or have the effect, of unfairly draining the assets available to satisfy creditor claims or dilute legitimate creditor claims.[18] There are two types of fraudulent transfers: (1) those made with actual intent to hinder, delay, or defraud (actual fraud); and (2) those made under circumstances that constitute constructive fraud. In this case, r2 Advisors presented a constructive fraud case.

The parties stipulated that the transfers occurred within two years of Red Eagle's bankruptcy filing and that Red Eagle was insolvent at the time of the transfers. The two remaining factors to consider are: (1) whether Red Eagle had a property interest in the fuel supply rights transferred to Equitable; and (2) whether Red Eagle received less than a reasonably equivalent value in exchange for the transfers to provide fuel to the four Retail Stores.

A.  Debtor's interest in the property

The phrase "interest of the debtor in the property," in the bankruptcy fraudulent transfer statute, refers to property that would have been part of the bankruptcy estate had it not been transferred prior to commencement of bankruptcy case.[19] Section 541(a)(1) provides that estate property includes "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever located and by whomever held. The scope of the estate's property interests is quite broad, and "includes any contract rights that a debtor possesses at the time of the bankruptcy filing."[20] Contractual rights fall within the reach of § 541(a).[21]

Prior to filing for bankruptcy protection, Red Eagle attempted to sell the fuel-supply rights of the four Retail Stores to IPC. ExxonMobil knew of the sale and that Red Eagle intended

---

[18] *In re Brooke Corporation, et al.*, 541 B.R. 492, 507 (Bankr. D. Kan. 2015).
[19] *In re Vaughan Co. Realtors*, 500 B.R. 778, 794-95 (Bankr. D.N.M. 2013).
[20] *In re Res. Tech. Corp.*, 254 B.R. 215, 220 (Bankr. N.D. Ill. 2000).
[21] *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008).

to transfer the fuel-supply rights as part of that sale. The sale failed to materialize. Ultimately, and as a part of the bankruptcy case, Red Eagle sold all its assets to Hall & Associates. The transaction included the assumption of the Red Eagle PMPA and the sale of the balance of Red Eagle's fuel-supply rights. The inclusion of the fuel-supply rights in the sale agreements evidences Red Eagle's property interest in the fuel supply rights. These rights would have been assets in Red Eagle's bankruptcy case, had the transfers to Equitable not occurred.

Additionally, r2 Advisors alleges that Red Eagle had interest in the rights to supply the Retail Stores with fuel based on an implied-in-fact contract under Wyoming law. Under Wyoming law, an implied-in-fact contract arises from a "mutual agreement and intent to promise, which is found in the acts or conduct of the party sought to be bound."[22] The parties conduct creates an implied-in-fact contract.[23] The conduct from which the inferences are drawn "must be sufficient to support the conclusion that the parties expressed a mutual manifestation of an intent to enter into an agreement."[24]

Red Eagle's longstanding history of exclusively providing fuel to the Retail Stores supports a finding of an implied contract. It is also supported by ExxonMobil's inability to arbitrarily obtain or release retail stores. Instead, it must work with Red Eagle, its branded wholesale distributor. Also, ExxonMobil did not receive direct payments from the Retail Stores for fuel purchases at the pump, except through credit card transactions. Red Eagle paid for the fuel. The conduct between Red Eagle and ExxonMobil establishes an implied-in-fact contract.

The court finds that Red Eagle had a property interest in the fuel-supply rights that it transferred. The PMPA, BIP agreements and an implied-in-fact contract support this conclusion.

---

[22] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1151 (10th Cir. 2011) (citing *Trabing v. Kinko's, Inc.*, 57 P.3d 1248, 1252 (Wyo. 2002)).
[23] *Birt v. Wells Fargo Home Mortg., Inc.*, 75 P.3d 640, 649 (Wyo. 2003).
[24] *Birt*, 75 P.3d at 649 (citing *Shaw v. Smith*, 964 P.2d 428, 435–36 (Wyo. 1998)).

B. Reasonably equivalent value

The primary factor for the court to address in this adversary proceeding is r2 Advisors'

allegation that Red Eagle did not receive reasonably equivalent value in exchange for the transfer

based upon a constructive fraud theory. The party seeking to avoid a constructively fraudulent

transfer bears the burden of proving, that the transferor *did not* receive reasonably equivalent

value.[25] The proponent must prove the elements by a preponderance of the evidence.[26]

Whether a transfer is for reasonably equivalent value is principally a question of fact, and

is determined as of the date of the transfer.[27] Satisfaction of a present or antecedent debt

constitutes value.[28] However, courts do not use subsequent events as a measure of reasonably

equivalent value.[29] A determination of reasonably equivalent value requires a court to consider

whether the "transferor's unsecured creditors were better off before or after the transfer" by

calculating the net value received from a transaction including any benefit the transferor

receives.[30] "An examination into reasonably equivalent value includes three inquiries: (1)

whether value was given; (2) if given, whether it was given in exchange for the transfer; and (3)

whether that transferred was reasonably equivalent to that received."[31]

a. *Was value given?*

Value is a critical concept for § 548. Value means "property, or satisfaction or securing

of a present or antecedent debt of the debtor."[32] Equitable argues that Red Eagle received value

---

[25] *In re Expert South Tulsa, LLC, et al. v. Cornerstone Creek Partners, LLC, (In re Expert South Tulsa, LLC),* 534
B.R. 400, 413 (B.A.P. 10th Cir. 2015), *aff'd in In re Expert S. Tulsa, LLC,* 842 F.3d 1293 (10th Cir. 2016).
[26] *In re Brooke Corp.,* 541 B.R. at 508.
[27] *In re Adam Aircraft Indus., Inc.,* 510 B.R. 342, 354 (B.A.P. 10th Cir. 2014), *aff'd,* 805 F.3d 888 (10th Cir. 2015).
[28] *See* 11 U.S.C. § 548(d)(2)(A); *In re Expert S. Tulsa, LLC,* 842 F.3d at 1297; *In re Villamont-Oxford Associates
Ltd. Partnership,* 236 B.R. 467, 481 (Bankr. M.D. Fla. 1999).
[29] *In re Brooke Corp.,* 541 B.R. at 510-11.
[30] *Id. In re Expert S. Tulsa, LLC, 534 B.R. at 413.*
[31] *In re Brooke Corp.,* 541 B.R. at 510 (citing *LTF Real Estate Co., Inc. v. Expert South Tulsa, LLC (In re Expert
South Tulsa, LLC),* 522 B.R. 634, 652 (B.A.P. 10th Cir. 2014).
[32] § 548(d)(2)(A).

from Equitable's assumption of Red Eagle's liability to ExxonMobil for the balance of the BIP

Agreements with the Four Retailers for $135,745.50. To the contrary, r2 Advisors asserts that

Red Eagle did not receive any value because ExxonMobil would forgive the BIP Agreement

liabilities as the terms expired, if there was no preceding termination or violation of the

Agreements. Equitable, having assumed Red Eagle's risk of liability, did not have to pay any

amounts under the Agreements as they eventually expired; therefore, Red Eagle did not receive

value for the transfers.

Had Red Eagle not pursued a transfer of the BIP Agreements and its repayment

obligations to Equitable, Red Eagle would have been liable to ExxonMobil for amounts owed

under the four Retailer Stores' BIP Agreements. ExxonMobil's filed proof of claim asserting

$236,615.46 for other BIP Agreement loan debts not at issue in this adversary is evidence of

such.[33] Thus, ExxonMobil's claim would have included the additional $135,745.50, but for the

transfers.[34] The subsequent event, Equitable not having to pay back the BIP Loan amounts to

ExxonMobil does not change the fact that the assumptions relieved Red Eagle of liability at the

time of the transfers. Red Eagle received a direct benefit from the transfer of its BIP obligations.

This factor is satisfied.

b. *Was the value given in exchange for the transfer?*

The parties agreed that there was an exchange, which this court determined had value.

This factor is satisfied.

---

[33] Claim No. 45, p. 2 and Ex. B (Under the BIP Agreements' terms, if, inter alia, Debtor's franchise relationship with ExxonMobil is terminated or not renewed, Red Eagle was obligated to pay a compensatory dollar amount to ExxonMobil for losses related to that termination or non-renewal, as outlined in the Reimbursement Schedules attached to each of the BIP Agreements.). For clarity sake, the court does not use the amount of the claim to determine the value of the four Retail Stores' Agreements, as these are not included in ExxonMobil's claim.

[34] While Fast Lane refused to sign a promissory note in favor of Equitable, ExxonMobil waived the requirement after the transfer occurred, so ExxonMobil could have included the Fast Lane Agreement loan amounts in its claim had no transfer occurred.

c.  *Was the value of the fuel-supply rights reasonably equivalent to what Red Eagle received?*

After determining whether a debtor received any value, courts then inquire whether that value was reasonably equivalent to what the debtor transferred.[35] Factors that bankruptcy courts consider when deciding whether a debtor received reasonably equivalent value for a challenged transfer, within the meaning of constructive fraud in bankruptcy, include: (1) the good faith of the parties; (2) disparity between the fair value of the transferred property and what the debtor received; and (3) whether the transaction was an arm's length.[36] In the fraudulent transfer context, the "totality of circumstances" test used to determine reasonably equivalent value is fact-intensive and may include consideration of fair market value.[37] Factors also include considering the transaction's arms-length nature, the economic circumstances and relationship of the parties, the maturity, competitiveness and efficiency of the market, and industry standards.[38]

Plaintiff retained Josh Harrison to determine the value of the transferred fuel-supply rights. Mr. Harrison, using the income approach, valued the transfers from $170,631.00 to $260,725.00. The $170,361.00 represents the present value income with an additional $90,094.00 residual value for a total value of $260,725.00. Equitable argues that Red Eagle gave nothing of value, but in the alternative, Mr. Harrison overstates the value.

There are three general methods of fair market valuation – cost, income and market.[39] Appraisal theory dictates that appraisers consider all methods of valuation. There is no requirement to complete all methods when there is no or unreliable data. The appraiser must use

---

[35] *In re Brooke Corp.,* 541 B.R. at 510 (citing *In re Expert S. Tulsa, LLC,* 522 B.R. at 652).
[36] *In re Merrillville Surgery Ctr., LLC,* No. 2:12-CV-253-TLS, 2013 WL 3338418, at *5 (N.D. Ind. July 2, 2013) (citing *In re Roti,* 271 B.R. 281, 295 (Bankr. N.D. Ill. 2002)).
[37] *In re Commercial Fin. Servs., Inc.,* 350 B.R. 559, 576 (Bankr. N.D. Okla. 2005).
[38] *Id.* at 577.
[39] *United States v. Certain Interests in Prop. Situate in Adams Cty., State of Colo. et al.,* 239 F.Supp. 822, 824 (D. Colo. 1965).

his professional judgment to determine the most appropriate methods based on the available reliable data. Mr. Harrison, in evaluating the transferred fuel-supply rights, used the income approach to arrive at value. This approach involves estimating anticipated gross income and expenses from the property.[40] He did not use the cost or market approaches because of the lack of available reliable public information.

To determine the gross income, Mr. Harrison testified he "backed-in" to the rack rate costs, by deducting taxes and freight costs and used Red Eagle's prompt payment discount of 1.0%. Red Eagle argues it was error for him to consider the prompt payment discount as ExxonMobil had revoked Red Eagle's discount at the time of the transfer. It further argues that including a residual value was incorrect because his conclusion of automatic renewal on the same terms was contrary to industry standard.

(i) Use of prompt payment discount

"Fair market value is an objective test that relies on a hypothetical buyer and seller."[41] The buyer and seller are hypothetical persons, not specific individuals or entities, and the individual characteristics of these hypothetical persons are not automatically the same as the actual parties to the transaction.[42] It is presumed that the hypothetical buyer and seller will achieve the maximum economic advantage.[43]

Because the value is viewed from the perspective of a hypothetical buyer, the prompt payment discount personal to Red Eagle is not controlling. A prospective buyer would consider the prompt payment discount potential in determining an amount to pay for the fuel-supply rights. Therefore, it was correct for Mr. Harrison to include this in the appraisal. However, Mr.

---

[40] *Schwab v. C.I.R.,* 67 T.C.M. (CCH) 3004 (T.C. 1994).
[41] *Estate of Kahn v. C.I.R.*, 125 T.C. 227, 231 (2005).
[42] *Id.*
[43] *Id.*

Harrison admitted that he was not aware that ExxonMobil controlled the prompt payment

discounts, and that he was not aware that ExxonMobil could deny Red Eagle credit per the terms

of the PMPA. Mr. Harrison also admitted that he was not aware of ExxonMobil's denial of a

prompt payment discount to Red Eagle. Despite the consideration of prompt payment discounts

being appropriate within appraisal theory, he admitted his misunderstanding inaccurately over-

valued the prompt payment discount and thus, the value of the transfer.

(ii)    Residual value

In determining the total value of the fuel-supply rights Red Eagle transferred to

Equitable, Mr. Harrison included a residual value for the four transfers. He explained this is a

reasonable expectation when an analyst values an agreement between parties. In his analysis, Mr.

Harrison assumed a renewal of the agreements with similar terms and applied a 20% commission

rate. He also assumed the Retail Stores would renew the agreements for an additional ten years

based on his discussions with Mr. Hinze and an investment banker. However, he made this

assumption without discussing it with representatives of the four Retail Stores.

His assumptions were rebutted in multiple ways. First, Mr. Harrison misunderstood the

existence of "dealer agreements" between Red Eagle and the Retail Stores, instead relying upon

implied contract and information provided by Mr. Hinze. Second, Mr. Deberg of Ron's Exxon

and Rodeo West, explained he was free to change wholesale suppliers at any time, but faced

financial risk if he decided to de-brand from ExxonMobil. Third, Mr. Bailey, who has at least

forty years in the industry, testified that it is routine for a retail outlet to shop around and enter

new BIP's with other brands because they can give the store new money. He explained the

incumbent supplier is actually at a disadvantage because they have already provided funds. New

brands can give retail stores new incentive "BIP" money. Beau Powers confirmed this

explanation, and confirmed that dealers change brands "on a frequent basis." Finally, Mr.

Harrison admitted that without a contract, Retail Stores could terminate the relationship at any

time.

The evidence does not support including a residual value that represents one-third of the

total value. The evidence directly contradicts any substantial value in retail stores renewing for a

specific ten-year period. Without an agreement, there is nothing to be extended for any specific

term and in fact, the Retail Stores could terminate the supply agreement before the end of the

BIP term.

The court has additional concerns with the appraisal. First, there is no accounting of Red

Eagle's expenses associated with the fuel-supply agreements. Mr. Harrison removed the freight

charge billed to the Retail Stores, but the discounted cash flow looks at net income after all

expenses. The discounted cash flow analysis entails the forecasting of income and expenses over

a period of time, and then discounts the net income into present value.[44] A buyer would take into

account expenses such as income taxes, payroll, and overhead.

The fact that a retail store can change suppliers at any time also decreases value. While

the parties did not challenge the discount factor used, the Present Value Factor, determined

through the Weighted Average Cost of Capital (WACC) approach could have been higher to

account for the risk of termination that a purchaser of these agreements would incur. As Mr.

Harrison explained, the higher the factor, the lower the value.

Mr. Harrison explained during testimony that the value is in the agreement to supply fuel

to the dealers and not the BIP Agreements. He admitted he had not reviewed any of these

agreements. However, he explained that even without written dealer agreements, there is still

---

[44] *In re Whitney Lane Holdings, LLC*, No. 08-72076-478, 2009 WL 2045700, at *4 (Bankr. E.D.N.Y. July 6, 2009).

value in the contractual relationship between Debtor and the Retail Stores. Unfortunately, the record does not establish the actual value of these contractual relationships is equivalent to his conclusion of value presented during the hearing.

It is not possible for the court, outside of disregarding the residual, to make a dollar reduction to the appraisal. The court agrees there is value to the transferred fuel-supply agreements transferred. It does not matter whether they are an implied contract, customer relationship or simply an income stream. Taking into consideration the reduction in value by disregarding the residual value and the potential reductions for the appraiser's misunderstanding of the source of agreements and discount, among the other issues discussed, there is no evidence of great disparity. The transaction was arms-length. There was no evidence Red Eagle acted in bad faith. In fact, just the opposite occurred in that Red Eagle tried to ensure that it did not hurt the Retail Stores by its failure to supply fuel. Plaintiff did not meets its burden to establish that Equitable did not give reasonably equivalent value.

## 2. Initial transferee/conduit

Equitable presented, as a defense, that it was not the initial transferee in the transaction. It asserted as ExxonMobil had final approval, ExxonMobil was the initial transferee. Contrary to this defense, the parties' uncontroverted facts reflect that Equitable admits to being the initial transferee.[45] The court having found that r2 Advisors did not meet its burden establishing that the value received was not equitably reasonable, the court declines to address this issue.

## 3. Pre- and post-judgment interest

As the court rules in favor of Defendant, Plaintiff is not entitled to an award of interest, therefore, denies the request.

---

[45] See uncontroverted facts, 31, 32, and 33 and Equitable's Proposed Findings of Fact and Conclusions of Law (D.E. 57).

### 4.  Disallowance of Equitable's claim

Plaintiff r2 Advisors' second cause of action is for the disallowance of Equitable's claim under § 502(d), which states,

> Notwithstanding subsection (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section … or that is a transferee of a transfer avoidable under section …548 …, of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 550, or 553.

The court having found for Defendant Equitable, denies the request to disallow Equitable's proof of claim.

In conclusion, the court finds Plaintiff did not satisfy its burden that a fraudulent transfer occurred, finding for Defendant and against the Plaintiff. Additionally, the court finds for Defendant and denies Plaintiff's requests for interest and to disallow Defendant's claim.

This decision constitutes the court's findings of facts and conclusions of law pursuant to Bankruptcy Rule 7052.  The court shall enter a separate order.

BY THE COURT

_Cathleen D. Parker_

2/27/2017

_____

Cathleen D. Parker
United States Bankruptcy Judge